UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

KIRSTEN CHILDRESS,                  Case No.: 6:25-cv-868

Plaintiff,

v.

NICHOLAS BLAKE MOORE,
eXp REALTY, LLC,
eXp WORLD HOLDINGS, INC.,
and Does 1-10.

Defendants.

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Kirsten Childress, by and through undersigned counsel, brings this Complaint against Defendants Nicholas Blake Moore, eXp Realty, LLC, and eXp World Holdings, Inc., and states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

2.     Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this district.

## PARTIES

3.     Plaintiff Kirsten Childress ("PLAINTIFF") is a natural person residing in the State of North Carolina. At all relevant times, she was affiliated as an independent contractor with eXp REALTY, LLC.

4.     Defendant Nicholas Blake Moore ("DEFENDANT MOORE") is a natural person who resides in Florida.

5.     Defendant eXp Realty, LLC ("DEFENDANT eXp REALTY") is a limited liability company organized under the laws of Washington with its principal place of business at 2219 Rimland Drive, Suite 301, Bellingham, Washington 98226.

6.     Defendant eXp World Holdings, Inc. (hereinafter collectively referred to with eXp Realty, LLC as "DEFENDANT eXp REALTY"), is the parent company of eXp Realty, LLC, and is a publicly traded company headquartered at 2219 Rimland Drive, Suite 301, Bellingham, Washington 98226.

7.     PLAINTIFF anticipates amending this Complaint to add additional defendants, including the Florida-based hospital and victim services center that

initially treated PLAINTIFF following the assault described herein. (This reference is made solely to preserve jurisdiction and is not intended to circumvent Florida's statutory pre-suit requirements under § 766.106.) Upon information and belief, the hospital failed to perform toxicology screening and contributed to the loss of critical forensic evidence, impairing the ability to seek justice. Said entities are located in this District and may be added once pre-suit requirements under Florida law are satisfied.

8.     PLAINTIFF is currently unaware of the names and identities of one or more Doe Defendants who were responsible for allowing DEFENDANT MOORE access to the ICEBAR Orlando event on May 19, 2023, despite not being a registered or invited guest to the event. These Doe Defendants may include event organizers, venue personnel, or individuals acting under the authority of DEFENDANT eXp. Plaintiff will amend this Complaint once their identities are discovered.

## FACTUAL ALLEGATIONS

9.     PLAINTIFF is a licensed real estate agent and joined eXp in April 2020.

10.    As an eXp agent, PLAINTIFF was required to pay DEFENDANT eXp $85 every month to support DEFENDANT eXp's multi-level marketing Revenue Share Program.

11.    On February 22, 2023, a lawsuit was filed in the Central District of California, *Acevedo, et al. v. eXp Realty, LLC, et. al.,* Case No. 2:23-cv-01304-AB-AGR ("*Acevedo* Complaint"), alleging that several of eXp's agents were drugged and sexually assaulted at DEFENDANT eXp recruiting events.

12.    On March 20, 2023, during a "Fire Friday" meeting, Glenn Sanford, CEO of DEFENDANT eXp World Holdings, LLC ("Sanford"), in response to the *Acevedo* Complaint, issued a public statement assuring his agents that DEFENDANT eXp takes sexual assault claims seriously, and that while DEFENDANT eXp should have taken these steps earlier, DEFENDANT eXp immediately will start sharing additional resources, phone numbers, and whistleblower hotlines as well as will create a task force made up exclusively of women to help address the needs of women in a male dominated industry in order to ensure the safety of female agents.  Further, Sanford reiterated that DEFENDANT eXp will ensure that his agents have a way to address DEFENDANT eXp directly if they feel they have been victimized such that they can get resolution without having to go to the legal system.

13.     Sanford also promised that the upcoming Shareholder's Summit would be safe for women.

14.     PLAINTIFF, a North Carolina-based real estate agent affiliated with eXp Realty, traveled to Orlando, Florida in May 2023 to attend DEFENDANT eXp's 2023 Shareholder Summit. The Summit was marketed as a business event intended to foster networking, training, and team growth.

15.     PLAINTIFF shared a suite at the Rosen Shingle Creek Resort in Orlando, Florida, located at 9939 Universal Boulevard, Orlando, Florida 32819 with two other eXp agents -- Colleen Marten and Victoria Singleton.

16.     eXp Agent Nathan Abbott also attended the Shareholder Summit and also had a hotel room at the Rosen Shingle Creek Resort.

17.     Abbott invited his videographer/photographer DEFENDANT MOORE to attend the conference to work at DEFENDANT eXp's conference and Abbott paid for DEFENDANT MOORE's room at the sister property of the Rosen Shingle Creek Resort, the Rosen Centre Hotel, which was located two miles west of Rosen Shingle Creek Resort at 9840 International Drive, Orlando, Florida 32819.

18.     Around 6:00 p.m. on Friday, May 19, 2023, PLAINTIFF was tired and wanted to stay in her hotel room; however, PLAINTIFF decided to join her

suitemates to attend an eXp vendor-hosted open bar networking party at ICEBAR Orlando, which was located at 8967 International Drive, Orlando, Florida 32819, approximately 2.3 miles from her hotel, Rosen Shingle Creek Resort.

19.    PLAINTIFF registered for the networking event at ICEBAR and received her online ticket at 6:10 p.m.



20.    Shortly thereafter, PLAINTIFF, along with her suitemates left their hotel and arrived at ICEBAR around 7:15 pm.

21.    In order to enter the ICEBAR, PLAINTIFF was asked by security to present her online ticket, which she did.  On information and belief, ICEBAR stamped her hand upon entry.

22.    The event was "open bar" with unlimited free alcohol; food also was served.

23.    The event was supposed to be for DEFENDANT eXp agents and DEFENDANT eXp staff only.  Members of DEFENDANT eXp's corporate leadership team attended this event, including Michael Valdes, president of eXp Global.

24.    PLAINTIFF recalls drinking 1-2 vodka cranberry cocktails over several hours while eating and socializing with colleagues.

25.    The next thing PLANTIFF recalls is being raped and strangled by DEFENDANT MOORE in his hotel room.

26.    PLAINTIFF has only limited flashes of memory from that night and relies on witness statements, text messages, screenshots, law enforcement records, and medical records to piece together what happened.

27.    According to the above-mentioned records, sometime around 10:00 p.m., PLAINTIFF's suitemates wanted to return to the hotel and notified PLAINTIFF that they were leaving.

28.    PLAINTIFF confirmed that she was fine and would meet them back at their hotel.

29.    DEFENDANT MOORE was also in attendance at the ICEBAR despite the fact he was not a licensed agent.

30.     PLAINTIFF does not know how DEFENDANT MOORE gained entry to the invite only event.

31.     When PLAINTIFF did not return to the hotel after an hour or so, PLAINTIFF's suitemates became worried and made multiple attempts to reach PLAINTIFF on her cellphone, but there was no answer or response.

32.     Eventually, a bartender from the ICEBAR answered PLAINTIFF's phone. The bartender did not know the identity of the owner of the phone and was not able to search for the owner but promised he would hold onto the phone until they could come retrieve the phone.

33.     PLAINTIFF's suitemates decided they should return to the ICEBAR to retrieve the phone and try to locate PLAINTIFF.

34.     As they approached the elevator bay to go down to the hotel lobby, the suitemates saw PLAINTIFF with a man who introduced himself as Nick Moore, Abbott's photographer for the event.

35.     Immediately, PLAINTIFF's suitemates noticed that something was wrong with PLAINTIFF. She was not acting like herself. Instead, she was belligerent, slurring her words, acting erratically; she was visibly impaired.

36.     The suitemates were able to communicate to PLAINTIFF that she had left her phone at ICEBAR. PLAINTIFF became visibly upset upon learning this

fact and threw her purse at her suitemates which surprised them as this also was completely out of character for PLAINTIFF.

37.    Despite her suitemates' pleas to stay with them, PLAINTIFF linked arms with DEFENDANT MOORE and took off down the hall.

38.    PLAINTIFF's suitemates immediately began searching for PLAINTIFF at the hotel.  They enlisted the help of other eXp agents, including someone in PLAINTIFF's upline – her sponsor agent's sponsor, Robin Mann. Together they searched multiple floors and spoke with hotel security but could not locate her anywhere.

39.    These eXp agents eventually located Abbott (the agent who invited and paid for DEFENDANT MOORE to be at the event) and told him that their friend was missing and asked for his help to locate her.  Initially, Abbott brushed them off and assured them that their friend was fine.  Eventually, Abbott reached out to DEFENDANT MOORE to placate the other eXp agents' concerns.

40.    In a sworn statement to the Orange County Sheriff's Department, written at 2:40 a.m. on Saturday May 20, 2023, Abbott described what happened next:

> I called [Moore] and was able to reach him.  [Moore]
> said [PLAINTIFF] mentioned she was married which
> [Moore] didn't realize as she was coming onto him, not

the opposite.  I asked [Moore] if he hooked up with her and he said no that he doesn't mess with married ladies. He said he called her an Uber for her from Rosen Centre to Rosen Shingle Creek.  He sent me a text that Uber showed on their map a pickup at 12:10 a.m. and a drop off back at Shingle Creek.  He said once he got that alert he went to bed.

I called again once her friends said she never arrived and it seemed like I woke him up.  He said he was walking down to the lobby to talk to the manager. The manager told him there was a _____ in the lobby that they called a cab for to take her to Single Creek.  Shortly after her friend _____called me to let me know she just arrived at the hotel and she was not alright.  She apparently said she was raped based on what her friends said.  I called Nick to let him know the situation and he acted startled and said that he hasn't seen her since he originally called her the Uber at 12:10 a.m.  He said whatever happened he was not involved in the slightest and was going back to bed.  That was the last I heard from him.

41.    Everything DEFENDANT MOORE told Abbott was untrue.

42.    In fact, the Uber screenshot that DEFENDANT MOORE sent to Abbott shows the opposite of what he said, as it details a ride from Rosen Shingle Creek (identified as the circle) to Rosen Center Hotel (identified as the square) at 12:10 a.m.



43.    According to Rosen Centre's security logs, DEFENDANT MOORE and PLAINTIFF entered his hotel room at 12:22 a.m.  No one exited the room again until 1:26 a.m.

44.    Furthermore, Rosen Centre Hotel surveillance videos show PLAINTIFF exiting DEFENDANT MOORE's hotel room crying as she was walking to the elevator.

45.    Rosen Centre Hotel staff told the law enforcement that they remembered PLAINTIFF coming to the front desk appearing disoriented, disheveled, and asking for help as she did not have her phone and didn't know where she was.  Hotel staff called her a taxi and gave her a voucher to return to her hotel at Rosen Shingle Creek.

46.    At approximately 2:00 a.m., PLAINTIFF returned to Rosen Shingle

Creek by taxi. She was met by friends, collapsed into their arms, and cried out:

"That wasn't my husband… he raped me."  PLAINTIFF was bruised, trembling,

and confused. Witnesses noted bruise marks on her neck and that PLAINTIFF was

in visible distress.

47.    EMS was called and arrived on scene at 2:36 a.m.

48.    According to the paramedics, PLAINTIFF exhibited acute emotional

trauma.

49.    EMS records show that PLAINTIFF told her friends that "she was

sexually assaulted by a man after she was at a bar, and she believes he may have

slipped something in her drink."  The records also reflect "bruising on her neck."

50.    At 3:04 a.m., PLAINTIFF was admitted to Orlando Health Dr. P.

Phillips Hospital. Medical staff documented significant memory loss, multiple

bruises on her breast, arm, thigh, a red linear mark on her neck, and genital

abrasions. Despite these findings, the hospital failed to perform toxicology

screening.

51.    At approximately 4:38 a.m., PLAINTIFF was transferred by law

enforcement to the Victim Service Center.  According to the records from Victim

Service Center, PLAINTIFF advised that she recalls meeting a man named

"Nicholas" and then the next thing she recalls is waking up to him sexually assaulting her while she being choked.

52.    At approximately 6:50 a.m., a certified Sexual Assault Nurse Examiner performed a forensic exam. Genital and body swabs were collected, along with PLAINTIFF'S underwear. No toxicology screening was performed.

53.    The State Attorney's Office later declined to prosecute, citing the absence of toxicology results. This failure directly impaired PLAINTIFF's ability to obtain justice, even though multiple pieces of physical, testimonial, and photographic evidence supported her claim of being drugged and assaulted.

54.    DEFENDANT MOORE repeatedly lied to cover up his involvement.

55.    DEFENDANT MOORE told Abbott that he personally put PLAINTIFF in an Uber to return her to Rosen Shingle Creek Resort as soon as he learned she was married.  The screenshot DEFENDANT MOORE sent to Abbott as "proof", surveillance records, and hotel records all confirm this was a lie.

56.    DEFENDANT MOORE initially told Abbott he had no physical contact with PLAINTIFF. However, DEFENDANT MOORE's DNA was detected from vaginal swabs collected from the rape kit.

57.    DEFENDANT MOORE later admitted to the law enforcement he choked PLAINTIFF during sex but claimed it was consensual. This is inconsistent

with PLAINTIFF's statements, memory loss, post-traumatic presentation, and physical evidence.

58.     Contrary to eXp's representations made in March 2023 by Glenn Sanford, as of May 20, 2023, eXp had no additional resources, phone numbers, whistleblower hotlines, task force made up exclusively of women to help address the needs of women, and no way for agents to address DEFENDANT eXp directly if they feel they have been victimized such that they can get resolution without having to go to the legal system.

## eXp's "Investigation"

59.     Within hours of being raped, eXp agent, Robin Mann reached out to Cory Haggard, DEFENDANT eXp's Director of Agent Compliance.  On a group text, Haggard assured the eXp agents that DEFENDANT eXp had done everything in their power to ensure that DEFENDANT MOORE would not be allowed into any of DEFENDANT eXp's events going forward.

60.     On May 22, 2023, Mann reached back out to Haggard to inform him that she has been contacted by three people all saying that Abbott was telling agents that DEFENDANT MOORE was the victim, not PLAINTIFF.  Mann further explained to Haggard that PLAINTIFF's behavior was the result of being drugged.

61.    In response, Haggard falsely told Mann "All we can do at this point is wait for the police investigation to conclude."  Haggard did not tell Mann that DEFENDANT eXp's own policies and procedures, and its own Standard Operating Procedures, required DEFENDANT eXp to launch an investigation based on her complaint.

62.    Instead, Haggard told Mann that he would have a conversation with Abbott.

63.    Several months later, Mann again contacted Haggard to let him know that Abbott and his team were still working with DEFENDANT MOORE.

64.    Colleen Martens, another eXp agent, begged Haggard to make sure that DEFENDANT MOORE would not be allowed to attend any of DEFENDANT eXp's future events.

65.    Haggard replied that he spoke with Abbott, and Abbott "confirmed" he was no longer working with DEFENDANT MOORE to which Mann replied "He (Abbott) is lying.  His team is writing all over the pictures and vice versa."

66.    On October 30, 2023, Mann reported to DEFENDANT eXp World Holdings' CMO, Carolyn Merchant and to its Chief Legal Officer, Jim Bramble, that Abbott was still telling people that PLAINTIFF was not raped, essentially calling PLAINTIFF a liar.

67.    As of the date of the filing of this Complaint, DEFENDANT

MOORE's website boasts he is the trusted photography partner for leading real

estate brands, including eXp.



68.    Despite receiving multiple complaints about Abbott disparaging

PLAINTIFF to other agents, DEFENDANT eXp failed to follow its policies and

procedures by not conducting any investigation into what happened and the extent

of Abbott's involvement.

69.    Despite actual notice that Abbott brought and paid for DEFENDANT

MOORE to attend the Shareholder Summit, and that Abbott was telling multiple

eXp agents that DEFENDANT MOORE was the victim, not PLAINTIFF,

DEFENDANT eXp Realty and DEFENDANT eXp World Holdings violated its

policies and procedures by failing to either conduct any investigation or take any

meaningful steps to restrict DEFENDANT MOORE's future attendance at

DEFENDANT eXp events.  Furthermore, DEFENDANT eXp made no effort to contact PLAINTIFF to get her statement nor did DEFENDANT eXp offer PLAINTIFF any internal reporting pathways.

70.    DEFENDANT eXp's failure to investigate is consistent with DEFENDANT eXp's pattern and practice of turning a blind eye and not investigating the conduct of its top agents, contrary to its own Policies and Procedures.

71.    DEFENDANT eXp's Policies and Procedures, which are incorporated into every eXp agent's Independent Contractor Agreement, explicitly commit to "zero tolerance for negative, aggressive and inappropriate behaviors," and promise that "all complaints of negative and inappropriate behaviors will be taken seriously and followed through to resolution."

72.    Furthermore, according to DEFENDANT eXp's Standard Operating Procedures, when the Compliance Department receives a written complaint alleging a serious policy violation from an Agent or representative of the company, a member of the Compliance team should perform the following steps:

**Step 1:** Open Case File

**Step 2:** Compliance Officer investigates the complaint under close supervision from the director of agent compliance.  This investigation should

include an interview of the complainant, any witnesses, and the alleged

offending agent.  Witnesses and other interviewed should provide written

statements where possible.  Copies of other evidentiary documents should be

collected and attached to the case file.

**Step 3:** The compliance officer reviews the results of the investigation with

the director of agent compliance and eXp's Chief Counsel.  The director of

agent compliance will work with the compliance officer to help resolve any

outstanding issues in preparation for the compliance committee.

**Step 4:** The chairman of the compliance committee will present the case to

the compliance committee during regularly scheduled meetings and

recommend appropriate discipline to the compliance committee based on the

facts, circumstances and similar previous cases.

**Step 5:** The compliance committee votes of appropriate action to resolve the

matter.  The director of agent compliance will work with the compliance

officer to notify the agent of the committee's final decision.

**Step 6:** The compliance officer will, under the supervision of the director of

the Compliance department, follow up to ensure sanctions, if there are any,

are carried out and the case file is closed with an attached closing memo.

73. Despite this contractual commitment, DEFENDANT eXp failed to follow its Standard Operating Procedures and failed to conduct any investigation as required by its Policies and Procedures.

74. DEFENDANT eXp Realty's failure to investigate or take corrective action, despite possessing real-time notice, violated its own Code of Conduct and "zero tolerance" policy, and directly contributed to PLAINTIFF's resignation and long-term trauma.

## CAUSES OF ACTION

### Count I: Sexual Battery
### (Against DEFENDANT Nicholas Moore)

75. PLAINTIFF realleges and incorporates Paragraphs 1–74 as if fully set forth herein.

76. DEFENDANT MOORE, without PLAINTIFF's consent and while PLAINTIFF was visibly impaired and incapable of giving legal consent, engaged in sexual intercourse with Plaintiff.

77. DEFENDANT MOORE's actions constituted harmful and offensive contact that was intentional and unprivileged.

78.     As a direct and proximate result of DEFENDANT MOORE's conduct, PLAINTIFF suffered physical injury, emotional trauma, humiliation, and long-term psychological harm.

## Count II: Intentional Infliction of Emotional Distress
### (Against DEFENDANT Nicholas Moore)

79.     PLAINTIFF realleges and incorporates Paragraphs 1–74 as if fully set forth herein.

80.     DEFENDANT MOORE's conduct—engaging in violent sexual activity with a visibly incapacitated monogamous married mother of two while attending a work conference; lying about her whereabouts to PLAINTIFF's friends as they were desperately trying to locate her; abandoning her without a phone or identification while barefoot and disoriented; referring to her publicly as a bitch and a liar—was extreme and outrageous by any standard of decency.

81.     DEFENDANT MOORE either intended to cause severe emotional distress or acted with reckless disregard of the probability of causing such distress.

82.     PLAINTIFF suffered severe emotional distress as a direct and proximate result of DEFENDANT MOORE's actions.

## Count III: Negligent Misrepresentation

## (Against DEFENDANT eXp Realty, LLC and DEFENDANT eXp World Holdings, Inc.)

83.    PLAINTIFF realleges and incorporates Paragraphs 1-74 as if fully set forth herein.

84.    DEFENDANT eXp publicly represents that it enforces a "zero tolerance" policy for misconduct, including sexual harassment and assault, and that it investigates all such complaints to resolution.

85.    These representations were made in DEFENDANT eXp's Policies and Procedures, Code of Conduct, and public statements by its CEO and executive leadership.

86.    Glenn Sanford, DEFENDANT eXp World Holdings, Inc.'s CEO, further promised that eXp's 2023 Shareholder Summitt would be safe for women.

87.    PLAINTIFF relied on these representations as a condition of her attendance at the conference as well as her continued affiliation with the company.

88.    In reality, DEFENDANT eXp failed to keep PLAINTIFF safe, failed to enforce its zero-tolerance of its harassment policy and failed to conduct an investigation.

89.    PLAINTIFF believed that DEFENDANT eXp was investigating the incident and believed that DEFENDANT eXp was taking meaningful action on her

behalf.  Had PLAINTIFF known that no such investigation was occurring,
PLAINTIFF would have terminated her relationship with DEFENDANT eXp
sooner.  Instead, PLAINTIFF continued to remain at DEFENDANT eXp and
continued to pay DEFENDANT eXp monthly fees.

90.    DEFENDANT eXp's misrepresentations caused PLAINTIFF to suffer
monetary damages and emotional distress.

### Count IV: Breach of Contract
### (DEFENDANT Against eXp Realty, LLC and DEFENDANT eXp World Holdings, Inc.)

91.    PLAINTIFF realleges and incorporates Paragraphs 1–74 as if fully set
forth herein.

92.    As part of her affiliation with DEFENDANT eXp Realty, PLAINTIFF
entered into an Independent Contractor Agreement ("ICA") with DEFENDANT
eXp Realty, LLC and DEFENDANT eXp World Holdings, Inc.

93.    DEFENDANT eXp's Policies and Procedures are incorporated into
PLAINTIFF's ICA by reference and are hyperlinked to the ICA.

94.    Additionally, DEFENDANT eXp's agents are subject to
DEFENDANT eXp's Code of Conduct and Policies and Procedures.

95.    DEFENDANT eXp's Policies and Procedures, adopted as binding on
affiliated agents, explicitly committed to a "zero tolerance" policy for harassment

and misconduct, and promised that all complaints would be "taken seriously and followed through to resolution."

96.    These policies created binding obligations under PLAINTIFF's agent relationship with DEFENDANT eXp.

97.    DEFENDANT eXp materially breached those obligations by failing to initiate any meaningful investigation into PLAINTIFF's report, failing to communicate with her, failing to preserve communications and evidence, and allowing the accused individual continued access to DEFENDANT eXp-sanctioned events.

98.    As a result of DEFENDANT eXp's breach of its contractual commitments, PLAINTIFF suffered damages including but not limited to emotional distress, lost income, and reputational harm.

## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFF respectfully requests judgment against Defendants as follows:

A. Compensatory damages in an amount to be determined at trial;

B. Punitive damages against DEFENDANT Moore and the eXp Defendants;

C. Injunctive relief requiring policy reform and reporting transparency at

eXp;

D. Pre-judgment and post-judgment interest;

E. Attorneys' fees and costs;

F. Any other relief the Court deems just and proper.

Respectfully submitted this 19th day of May, 2025.

By: /s/ Samantha Katen
Samantha Katen
Florida Bar # 29087
Aylstock, Witkin, Kreis & Overholtz, PLLC
17 East Main Street, Suite 200
Pensacola, Florida 32502
Phone: 850-202-1010
Fax: 850-916-7449
SKaten@awkolaw.com
www.awkolaw.com

Andrea S. Hirsch
GA 666557 (PHV application pending)
Brooke F. Cohen
TX 24007019 (PHV application pending)
COHEN HIRSCH, LP
5256 Peachtree Road, Suite 195-E
Atlanta, Georgia 30341
Tel: (678) 268-4683
brooke@cohenhirsch.com
andrea@cohenhirsch.com

Jennifer A. Lenze
CA 246858 (PHV application pending)
LENZE LAWYERS, PLC

999 Corporate Drive, Suite 100
Ladera Ranch, California 92694
Telephone (310) 322-8800
jlenze@lenzelawyers.com

Attorneys for Plaintiff